UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **CHRIS LEE PATTERSON** | * | **CIVIL ACTION NO. 10-0600** |
| **VERSUS** | * | **JUDGE DONALD E. WALTER** |
| **MICHAEL J. ASTRUE, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

<u>**REPORT AND RECOMMENDATION**</u>

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and ©. For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

<u>**Background & Procedural History**</u>

Chris Patterson filed the instant application for Title II Disability Insurance Benefits on November 1, 2007. (Tr. 92-94). She alleged disability as of April 28, 2005, because of "back and neck problems." (Tr. 128). The claim was denied at the initial stage of the administrative process. (Tr. 46-51). Thereafter, Patterson requested and received a December 4, 2008, hearing before an Administrative Law Judge ("ALJ"). (Tr. 27-45). However, in an April 22, 2009, written decision, the ALJ determined that Patterson was not disabled under the Act, finding at Step Five of the sequential evaluation process that she was able to make an adjustment to work that exists in substantial numbers

in the national economy. (Tr. 11-26). Patterson appealed the adverse decision to the Appeals Council. On February 16, 2010, however, the Appeals Council denied Patterson's request for review; thus, the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

On April 13, 2010, Patterson sought review before this court. She alleges the following errors,

(1) the ALJ's reasons for rejecting the assessment of plaintiff's treating physician is not supported by substantial evidence;

(2) the ALJ failed to properly evaluate plaintiff's subjective complaints and credibility; and

(3) the Commissioner did not meet his burden at Step Five of the sequential evaluation process.

### Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3) An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4) If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

> (5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See, Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## Analysis

### I. Steps One, Two, and Three

The ALJ determined at Step One of the sequential evaluation process that Patterson had not engaged in substantial gainful activity during the relevant period. (Tr. 16). At Step Two, he found that Patterson suffers severe impairments of obesity, hypertension, herniated nucleus pulposus at C5-6, and degenerative disc disease of the lumbar spine. *Id*. He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at Step Three of the process. (Tr. 20-21).

### II. Residual Functional Capacity

The ALJ next determined that Patterson retains the residual functional capacity to perform sedentary work, with the ability to occasionally: balance, stoop, kneel, crouch, crawl, climb

4

ramps/stairs (but not ladders, ropes or scaffolds), and to reach overhead. (Tr. 21).[1]

In so deciding, the ALJ discounted Patterson's testimony and the assessment of nurse practitioner, Lynette Wade, as endorsed by Steven Venters, M.D. Instead, he effectively credited the findings of the consultative physician, David Hebert, M.D., and the non-examining agency physician, Edward Dean, M.D.

    a)    <u>Chronology of Relevant Medical Evidence</u>

Patterson's alleged inability to work stems from cervical and lumbar pain that became symptomatic in late 2004, after she was struck from behind by a forklift while working at Wal-Mart. Although the medical record includes treatment notes for epigastric disorders, a thyroid cyst, and gynecological matters, there is no indication that these conditions lasted more than 12 months, or otherwise limited her functional capacity. Accordingly, the court's focus is upon the medical evidence related to plaintiff's back condition.

On February 3, 2005, Sidney Bailey, M.D. examined Patterson upon referral by Steven Venters, M.D. (Tr. 186). Dr. Bailey noted that Patterson was injured when she was struck from behind by a forklift, while working at Wal-Mart. *Id*. However, she did not notice any acute symptoms until a couple of days later. *Id*. She denied radicular complaints, and continued to work. *Id*. Her main complaints were neck and back discomfort. *Id*. She denied paresthesias or dysesthesias. *Id*.

---

[1] Sedentary work entails:
> . . . lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a).

5

Examination showed forward flexion lumbar spine only about 50 percent of normal, with minimal if any reversal of the lumbsosacral curve. *Id*. Reflexes were hyperactive and equal in both lower extremities. *Id*. She had good bi-manual motor strength in all muscle groups. *Id*. No hypesthesias or paresthesias was noted. *Id*. Bailey diagnosed pre-existing cervical degenerative disc disease and lumbar and cervical strain/sprain. *Id*. He recommended home cervical traction, outpatient therapy, and that she should continue to work. *Id*.

Patterson attended physical therapy sessions from February to March 2005. Physical therapy notes from March 16, 2005, indicate that Patterson reported increased pain at work, with headaches. (Tr. 174). She did a lot of lifting, pulling, and standing at work. *Id*. The therapist remarked that Patterson may be re-irritating her neck and back with the activities that she was performing at work. *Id*.

Patterson was discharged from physical therapy on March 24, 2005. (Tr. 168). At that time, her neck and back pain was between two and three on a ten point scale. *Id*. Workers' compensation would not pay for further visits. *Id*. Patterson elected not to continue physical therapy on her own insurance. *Id*. The physical therapist opined, however, that further treatment would have been appropriate. *Id*.

On March 10, 2005, Patterson returned to Dr. Bailey. (Tr. 185). Although she complained of fairly severe pain, there was no evidence of radiculopathy or myelopathy in the upper or lower extremities. *Id*. Bailey indicated that she should not work. *Id*.

A March 22, 2005, note indicates that Patterson continued to work. (Tr. 185). The note added, however, that she should be on light duty until her next appointment. *Id*.

Dr. Bailey's progress note from April 7, 2005, remarks that Patterson continued to complain of

pain. (Tr. 183). She reported some paresthesias and hypesthesias in the ulnar fingers of both hands, left greater than right. *Id*. Actually, on her right, she reported diffuse paresthesias. *Id*. She had subjective hypesthesias in the ulnar distribution of the left hand. *Id*. Baily recommended a cervical spine MRI. *Id*. She was to continue light duty work. *Id*.

An April 25, 2005, cervical MRI indicated normal alignment without acute fracture or dislocation. (Tr. 188-189). The MRI revealed degenerative changes predominantly present at the C5-6 level with mild to moderate degree of central disc herniation. *Id*. There was possible mild cord compression and some mild central spinal canal stenosis present. *Id*. There was less significant degenerative changes involved at the C6-7 level. *Id*.

On April 28, 2005, Dr. Bailey recommended that Patterson obtain a neurosurgical evaluation. (Tr. 181).

On May 6, 2005, Dr. Bailey wrote a note opining that Patterson could perform a sedentary job while waiting for a neural evaluation. (Tr. 180). Baily wrote another note on May 11, 2005, to clarify his prior recommendations. (Tr. 179). This time, he recommended that Patterson **not** work until she obtained a neurosurgical evaluation. *Id*.

On June 23, 2005, Patterson was seen by Bernie McHugh, Jr., M.D., a neurosurgeon. (Tr. 229-231). Upon examination, she exhibited bilateral upper extremity strength of 4+/5 in the right, upper extremity, specifically the biceps. *Id*. Left upper extremity and bilateral lower extremities revealed 5/5 strength. *Id*. There was no atrophy; muscle tone was normal. *Id*. Examination revealed mild decreased sensation in the right upper extremity. *Id*. Her gait was normal. *Id*. The cervical spine was non-tender to palpation, with a full range of motion. *Id*. McHugh opined that Patterson suffered from cervical pain, with right upper extremity radicular symptoms. *Id*.

Patterson continued to see Dr. McHugh on roughly a monthly basis through December 2005. During this period, however, McHugh deferred treatment until Patterson recovered from a scheduled hysterectomy. *See e.g.*, Tr. 226-227. On December 29, 2005, Dr. McHugh wrote that he was continuing Patterson on no-work status until she followed up with appropriate studies. (Tr. 228).

Meanwhile, in July-August 2005, Patterson underwent a series of cervical steroid injections with John Ledbetter, M.D. *See* Tr. 200, 198, 196. During a September 13, 2005, follow-up visit, Dr. Ledbetter noted that Patterson suffered from a C5-6 disc herniation, and had undergone three steroid injections. (Tr. 194-195). Following the injections, Patterson reported improvement in her right arm and right leg pain. *Id*. However, she continued to experience pain in her neck, the posterior scapular area, and lower back. *Id*. Her pain was 7 on a 10 point scale. *Id*. However, she maintained a fairly good range of motion in her neck. *Id*. Ledbetter diagnosed C5-6 disc herniation with cervical radiculitis and some axial pain and ongoing low back pain. *Id*. He recommended, *inter alia*, daily walking. *Id*.

A January 30, 2006, myelogram showed C5-6 small to moderate-sized posterior endplate osteophyte along with moderate sized diffuse disc bulge both effacing the thecal sac and resulting in minimal cord impingement; mild right neural foraminal stenosis at the C5-6 level secondary to bony encroachment; effacement of the anterior aspect of the thecal sac by a spur which resulted in minimal cord impairment. (Tr. 236-237). A mild posterior disc bulge at C6-7, did not result in cord impingement. *Id*.

On March 7, 2006, Dr. McHugh noted that he continued to see Patterson for complaints of cervical pain and discomfort. (Tr. 205). A CT myelogram showed spondylitic changes at the C5/C6 area with compression of the thecal sac. *Id*. He referred Patterson for an ENT consultation because of

a cyst on her right thyroid. *Id*.

After resolving her thyroid issue, Patterson returned to Dr. McHugh on January 18, 2007. (Tr. 223). During the visit, she complained of severe cervical pain, sub-occipital headaches and radicular symptoms. *Id*. McHugh recommended an MRI study. *Id*.

From May through October 2007, Patterson underwent treatment with a chiropractor. *See* Tr. 282-327.

On December 19, 2007, David Hebert, M.D., examined Patterson at the request of Disability Determination Services. (Tr. 328-332). Patterson explained to Hebert that ever since the forklift accident in December 2004, she had been in tremendous pain. *Id*. She reported numbness in her right hand and arm, and that sometimes, it was weak. *Id*. She took a great deal of medication. *Id*. Old records confirmed that she had significant injury to the cervical spine. *Id*. MRIs of the cervical spine and cervical myelogram indicated significant disc herniation at the C5-C6 level. *Id*. Upon examination, Hebert remarked that it was difficult to compel Patterson to complete a normal range of motion. *Id*. Her range of motion in her neck was 50 percent of normal. *Id*. However, she exhibited full range of motion in the lumbar spine, with negative straight leg raising and normal gait and station. *Id*. She also had no difficulty heel to toe walking. *Id*. All peripheral joints exhibited a full range of motion. *Id*. Motor strength in the right hand and arm was probably slightly decreased at 4/5 in all areas. *Id*. There was no definite decrease in sensation to pain, touch, or proprioception in any of the extremities. *Id*. Her legs had normal motor strength. *Id*. There was no evidence of depression or anxiety. *Id*. X-rays of the spine were normal. *Id*.

Hebert diagnosed degenerative disc disease of the cervical spine at the C5-C6 level, with mild osteoarthritis of the cervical spine, which limited motion of the cervical spine by about 50 percent,

9

causing mild motor neuropathies in the right upper extremity at 80 percent of normal. *Id.* Patterson also suffered chronic lumbar spine pain of uncertain etiology, with no significant impairment of function. *Id.* Hebert further documented arterial hypertension, poorly controlled, but with no evidence of end organ damage. *Id.* Because of her limitations, Hebert limited Patterson to lifting objects less than ten to fifteen pounds. *Id.* Otherwise, he would not restrict her activities. *Id.* Mentally, she was alert and quite functional. *Id.*

Following receipt of Dr. Hebert's findings, non-examining agency physician, A. Edward Dean, M.D. signed on January 9, 2008, a physical residual functional capacity form indicating that plaintiff retained the exertional capacity for sedentary work, with occasional postural activities, occasional overhead reaching, and the need to avoid even moderate exposure to hazards, machinery and heights. (Tr. 334-342).

On May 14, 2008, Patterson complained of cervical and lumbar pain and headaches. (Tr. 350). On May 21, 2008, Patterson went to the emergency room, where the record reflects painless range of motion in her neck. (Tr. 343-344). She also had normal sensation, motor strength, and no vertebral tenderness. *Id.* She exhibited normal range of motion in her extremities. *Id.*

A June 18, 2008, MRI of the cervical spine showed C5-6 disc degeneration, with resultant borderline to mild central spinal stenosis. (Tr. 363). A June 18, 2008, MRI of the lumbar spine showed mild degeneration of the L4-5 disc and a small central protrusion/herniation, with annular tear. (Tr. 364).

On September 12, 2008, Patterson was seen for right ankle pain when she fell down the stairs. (Tr. 368).

On November 18, 2008, nurse practitioner, Lynette Wade completed a medical source

statement, provided by plaintiff's attorney, which indicated that Patterson was capable of working two hours per day, standing for 15 minutes at a time, sitting for 60 minutes at a time, occasionally lifting up to ten pounds, occasionally able to bend, able to constantly manipulate her hands, but with the need to frequently elevate her legs during an eight hour work day. (Tr. 373). Wade characterized Patterson's pain as moderate, but severe, at times. *Id*. Steve Venters, M.D. countersigned the statement. *Id*.

b) Discussion

Plaintiff contests the ALJ's residual functional capacity assessment. She argues that the ALJ erred when he declined to adopt the limitations ostensibly assigned by her *treating* physician, Steve Venters, M.D. The court recognizes that

> "ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir.1985). **The treating physician's opinions, however, are far from conclusive. "[T]he ALJ has the sole responsibility for determining the claimant's disability status."** *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir.1990).
>
> **Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony**. The good cause exceptions we have recognized include disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence. *Scott*, 770 F.2d at 485. In sum, the ALJ "is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly." *Id.*; see also 20 C.F.R. § 404.1527(c)(2) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all the other evidence and see whether we can decide whether you are disabled based on the evidence we have.").

*Greenspan*, 38 F.3d at 237 (emphasis added).

11

Here, the ALJ acknowledged the medical source statement dated November 18, 2008, that was completed by Family Nurse Practitioner Lynette Wade, and to which, Dr. Venters affixed his signature. The ALJ, however, declined to assign great weight to the assessment because the nurse practitioner had not examined Patterson since May 14, 2008, and the evaluation was not detailed enough to support the ensuing limitations. *See* Tr. 19-20. In fact, notes from an emergency room visit one week after Patterson's May 14 visit with Nurse Wade, reflect painless range of motion in her neck, normal sensation and motor strength, no vertebral tenderness, and normal range of motion in her extremities. (Tr. 343-344). Furthermore, the record is devoid of any additional visits to Nurse Wade or Dr. Venters between May 14 and the November 18, 2008, assessment. Plaintiff contends, nonetheless, that more recent records "obviously exist." (Pl. Brief, pg. 8).

To the extent that plaintiff is arguing that the ALJ failed to fully and fairly develop the record, the court observes that the ALJ's failure to adequately develop the record does not automatically warrant reversal. *Kane v. Heckler*, 731 F.2d 1216, 1219-1220 (5th Cir. 1984). The claimant must still demonstrate that she was prejudiced thereby. *Id*. "To establish prejudice, a claimant must show that [s]he could and would have adduced evidence that might have altered the result." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (internal quotes omitted); *Kane, supra*. In other words, she should proffer the omitted evidence to the district court. *Kane, supra*.

Despite being represented by able counsel, both on appeal and at the time of the hearing, plaintiff has not proffered these missing progress notes. In all likelihood, this is because the records do not exist. The existing medical record indicates significant gaps between plaintiff's visits to Nurse Wade/Dr. Venters. For instance, in 2005, there was a seven month gap between visits (*see* Tr. 360-361); followed by an eighteen month gap until February 2007 (*see* Tr. 359-360); later in 2007, there

12

was a six month gap between July and January 2008 (*see* Tr. 351-352); finally, there was a four month gap between January and May 2008 (*see* Tr. 350-351). The intermittent nature of plaintiff's visits to Nurse Wade further support the ALJ's decision to assign less than controlling weight to her assessment.

Although not articulated by the ALJ, the court observes that plaintiff's treatment notes with Dr. Venters appear to be mostly, if not exclusively, signed by Nurse Wade. In fact, during a September 12, 2008, visit to the Green Clinic, Patterson reported that her family "doctor" was Lynette Wade. (Tr. 370). Thus, to the extent that Dr. Venters joined in Nurse Wade's November 18, 2008, assessment of plaintiff's limitations, he neither examined her, nor obtained the type of firsthand and ongoing contact that would qualify him as a treating physician. Moreover, as a nurse practitioner, Nurse Wade is an "other" medical source, rather than an "acceptable medical source." 20 C.F.R. § 404.1513(d)(1) & 416.913(d)(1). This distinction is material because only "acceptable medical sources" can provide "medical opinions" to show the severity of a claimant's impairment and how it affects her functional ability. 20 C.F.R. § 1527(a)(2) & 416.927(a)(2). Although the ALJ is required to consider evidence from "other sources" when evaluating an "acceptable medical source's" opinion, "the fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because, . . . 'acceptable medical sources' 'are the most qualified health care professionals.'" SSR 06-03p; *see also Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991) (recognizing that the regulations accord less weight to other sources such as chiropractors than to medical doctors); *Reynolds v. Astrue*, 2010 WL 583918 (N.D. Miss. Feb. 16, 2010) (observing that nurse practitioner is not afforded the same level of deference as a physician).

Plaintiff further argues that to the extent the ALJ determined that the questionnaire completed

13

by Nurse Wade was lacking, he was obliged to re-contact Nurse Wade and/or Dr. Venters.[2] The Fifth Circuit has recognized that "if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, *absent other medical opinion evidence based on personal examination* or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e)." *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000) (emphasis added). Because the instant record contains medical opinion evidence from an examining physician, Dr. Hebert, the ALJ was not obliged to recontact Dr. Venters/Nurse Wade. *See Holifield v. Astrue*, 402 Fed. Appx. 24 (5th Cir. Nov. 10, 2010) (unpubl.) (no need to recontact where the record contained medical opinion evidence from other treating physicians).[3] Dr. Hebert's opinion also obviated the need for the ALJ to consider the criteria set forth in 20 C.F.R. § 404.1527(d)(2) before rejecting Wade/Venters' assessment. *Holifield, supra* (citation omitted) (ALJ not required to perform detailed analysis of § 404.1527(d)(2) factors where the record contains reliable medical evidence from another examining physician); *see also Bullock v. Astrue*, 2007 WL 4180549 (5th Cir. 11/27/2007) (unpubl.).

In sum, the court finds that the ALJ's decision to place little weight, or to "effectively [reject]"

---

[2] The "questionnaire" format employed by Nurse Wade/Dr. Venters typifies "brief or conclusory" testimony sufficient to support an ALJ's decision not to accord the evidence "considerable weight." *Foster v. Astrue*, 2011 WL 480036 (5th Cir. Feb. 10, 2011) (unpubl.).

[3] Even if the ALJ was obliged to re-contact Wade/Venters, as stated previously, an ALJ's failure to adequately develop the record does not automatically compel reversal. *Hyde v. Astrue*, Docket No. 07-30748 (5th Cir. May 12, 2008) (unpubl.) (citing *Kane v. Heckler*, 731 F.2d 1216 (5th Cir. 1984)). Rather, plaintiff must demonstrate resulting prejudice. *Brock, supra*. Mere speculation that additional evidence might have made a difference does not suffice. *Hyde, supra*. Plaintiff has not made that showing here.

14

the limitation(s) recognized by Nurse Wade/Dr. Venters is supported by substantial evidence. *Ward v. Barnhart*, 192 Fed. Appx. 305, 308, 2006 WL 2167675 (5th Cir. 08/02/2006) (unpubl.); *see also, Nugent v. Astrue*, 2008 WL 2073891 (5th Cir. May 16, 2008) (ALJ entitled to discount treating physician's conclusory statement because it contradicted earlier treatment notes, objective medical findings, and other examining physicians' opinions). Instead, the ALJ effectively gave greatest weight to the opinion of Dr. Hebert – the physician who administered a comprehensive examination for purposes of assessing plaintiff's residual functional capacity, and the ensuing opinion by Dr. Dean, the non-examining agency physician, whose evaluation was premised upon Dr. Hebert's examination. This resolution of the contradictory medical evidence remained within the province of the ALJ.

Plaintiff further argues that the ALJ failed to properly evaluate her subjective complaints and credibility. When assessing credibility, the ALJ is required to consider the objective medical evidence, the claimant's statements, the claimant's daily activities, and other relevant evidence. SSR 96-7p. The ALJ also must consider inconsistencies in the evidence and conflicts between the claimant's statements and the remainder of the evidence. 20 C.F.R. § 404.1529(c)(4). However, the ALJ need not follow formalistic rules in his credibility assessment. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

In this case, the ALJ determined that plaintiff was "credible, in that her aches and pains were real to her, but by the objective medical evidence are not as disabling as alleged." (Tr. 21). In other words, the ALJ credited the limitations recognized by the consultative and agency physicians over Patterson's self-professed limitations. The ALJ's analysis satisfied the requirements of 20 C.F.R. § 404.1529, and his resolution is supported by substantial evidence. *See Undheim v. Barnhart*, 214 Fed. Appx. 448 (5th Cir. Jan. 19, 2007) (unpubl.) (opinion as a whole gave sufficient reasons and documentation for the ALJ's credibility determination); *Cornett v. Astrue,* 261 Fed. Appx. 644 (5th

15

Cir. Jan. 3, 2008) (unpubl.) (ALJ gave some weight to claimant's complaints; thus claimant's arguments that his subjective complaints were not given enough weight is unavailing); *Hernandez v. Astrue*, 2008 WL 2037273 (5th Cir. May 13, 2008) (unpubl.) (despite claimant's subjective allegations of pain, the ALJ gave "greatest weight" to treating physician's opinion).

## III.     Step Five

The ALJ concluded at Step Four of the sequential evaluation process that Patterson could not perform her past relevant work. (Tr. 22). Accordingly, he proceeded to Step Five. At this step, the ALJ determined that plaintiff was a younger individual, with at least a high school education, and that transferability of skills was immaterial. *See* Tr. 22. The ALJ observed that given Patterson's vocational factors, and if she were capable of the full range of sedentary work, the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. § 404.1569; Rule 201.21, Table 1, Appendix 2, Subpart P, Regulations No. 4. However, because Patterson's residual functional capacity did not permit her to perform the full range of sedentary work, the ALJ consulted a vocational expert ("VE") to determine the extent that her additional limitations eroded the occupational base for unskilled sedentary work. In response, the VE identified representative jobs that were consistent with the ALJ's residual functional capacity assessment.[4]

Plaintiff contends that the VE's testimony is flawed, because the ALJ's hypothetical failed to include her vocational background. *See* 20 C.F.R. § 404.1560(c) (vocational factors are a relevant

---

[4] Two representative jobs identified by the VE at the sedentary exertional level were Check Cashier, DOT # 211.462-026 and Telephone Solicitor, DOT 299.357-014. (Tr. 23, 32). In Louisiana, there are approximately 12,850 Check Cashier positions and 2,950 Telephone Solicitor positions. (Tr. 32). These jobs constitute a significant number of jobs in the "national economy." 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

consideration at Step Five). Prior to the hearing, however, the VE received relevant information concerning the claimant's background. (Tr. 84-85). Moreover, the VE's responses to the hypothetical clearly contemplated a claimant with Patterson's vocational background because she opined that the hypothetical claimant could not perform "her past relevant work [which] was at the light level." (Tr. 32). In addition, any error in the ALJ's hypothetical to the VE is not reversible, where, as here, the claimant or her representative was given the opportunity to correct the deficient hypothetical, but failed to do so. *Flores v. Astrue*, 2010 WL 3858173 (N.D. Tex. Aug. 30, 2010) (citing *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). If plaintiff's counsel harbored any doubts concerning the sufficiency of the hypothetical posed to the VE, he was obliged to explore the alleged omission and to press the issue upon cross-examination. Not only did counsel forego this opportunity at the hearing, he did not see fit to raise the matter in a post-hearing letter that he submitted to the ALJ. (Tr. 25-26). Plaintiff has neither argued, nor demonstrated that her vocational background precludes the jobs identified by the VE. *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (ALJ's omission does not require remand unless it affected claimant's substantial rights). Thus, any error was harmless. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (procedural perfection in administrative proceedings is not required).

## Conclusion

The ALJ in this case was tasked with determining whether plaintiff was disabled. In so doing, he considered the claimant's testimony, the medical record, and expert opinion evidence. The evidence was not uniform and could have supported a different outcome. However, the ALJ ultimately grounded his decision upon the opinions of the consultative and agency physicians. Such conflicts in the evidence are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation

omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted). This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton, supra.*[5]

For the foregoing reasons, the undersigned finds that the Commissioner's determination that Patterson was not disabled under the Social Security Act, is supported by substantial evidence and remains free of legal error. Accordingly,

**IT IS RECOMMENDED** that the Commissioner's decision to deny disability benefits be **AFFIRMED**, and that this civil action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. §636(b)(1)(c) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL**

---

[5] Admittedly, this court has expanded upon some of the reasoning given by the Commissioner for his decision. Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below." *January v. Astrue*, No. 10-30345, 2010 WL 4386754 (5th Cir. Nov. 5, 2010) (citation omitted). One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result. *Id.* This exception is applicable here. Further, the Fifth Circuit implicitly has sanctioned the federal courts' practice of assigning independent reasons for discounting newly adduced evidence. *See e.g., Foster, supra; Garth v. Astrue*, 393 Fed. Appx. 196 (5th Cir. Aug. 26, 2010) (unpubl.).

**BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 13th day of April 2011.

_____
KAREN L. HAYES
U. S. MAGISTRATE JUDGE